AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| FILED |
| CLERK, U.S. DISTRICT COURT |
| 10/2/2025 |
| CENTRAL DISTRICT OF CALIFORNIA |
| BY: ___GR___ DEPUTY |

United States of America

v.

MASSIMO AGOSTINO,

Defendants.

Case No.  2:25-mj-06104-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of October 1, 2025, in the county of Los Angeles in the Central District of California, the defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2), (b)(1) | Use and attempted use of unauthorized access devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

*/s/ Alex Le*
*Complainant's signature*

Alex Le, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:  October 2, 2025

*Judge's signature*

City and state:  Los Angeles, California    Hon. Karen Stevenson, U.S. Magistrate Judge
*Printed name and title*

AUSA:  Nicholas Purcell, x3752

## AFFIDAVIT

I, Alex Le, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.  This affidavit is made in support of a criminal complaint against and arrest warrant for Massimo Agostino ("AGOSTINO") for a violation of 18 U.S.C. § 1029(a)(2), (b)(1), (use and attempted use of unauthorized access devices).

2.  This affidavit is also made in support of an application for a warrant to search a black iPhone in a clear case, seized from AGOSTINO (the "SUBJECT DEVICE") and currently in the custody of Burbank Police Department, as described in Attachment A.

3.  The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft) (collectively, the "Subject Offenses"), as described more fully in Attachment B. Attachments A and B are incorporated herein by reference.

4.  The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. <u>BACKGROUND OF AFFIANT</u>

5.    I am a Special Agent of the United States Department of Health and Human Services ("HHS"), Office of Inspector General ("HHS-OIG"), and I have served in this capacity for approximately three years.  I have completed a combined 16 weeks of formal education and training at the Federal Law Enforcement Training Center's Criminal Investigator Training Program in Glynco, Georgia, and HHS-OIG's Special Agent Basic Training program in Largo, Maryland.  This training included instruction in conducting investigations of access device, bank, and wire frauds, identity theft, and related crimes, and the use of computers, cell phones, and other electronics to commit these crimes.  My formal education also includes a B.A. from the University of California, Irvine, and a J.D. from the University of Southern California.  I have led and participated in many aspects of criminal investigations, including: collecting and reviewing physical and electronic evidence; conducting surveillance; utilizing informants; interviewing witnesses, subjects, and targets of investigation; and preparing and serving subpoenas, search and arrest warrants, and other legal process.

6.    As an HHS-OIG Special Agent, I am a federal law enforcement officer within the meaning of 5 U.S.C. § 406, in that I am empowered by law and authorized by the Attorney

General to conduct investigations, seek and execute warrants, and make arrests for federal offenses.

7.    I am currently assigned to investigate complex financial crimes involving HHS-funded programs in the Central and Southern Districts of California.  I am working in conjunction with the United States Secret Service ("USSS"), Homeland Security Investigations ("HSI"), and the El Camino Real Financial Crimes ("ECR") Task Force.  The ECR Task Force is an HSI-sponsored task force comprised of local, state, and federal law enforcement personnel, whose duties are to investigate cyber and financial crimes, including activity in connection with the fraudulent use of access devices, payment card skimming and re-encoding, identity theft, money laundering, and other frauds.

### III. SUMMARY OF PROBABLE CAUSE

8.    Between January 2024 and January 1, 2025, the California Department of Social Services ("DSS") has detected more than $126.8 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKS, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

9.    On October 1, 2025, beginning at approximately 7:20 a.m., law enforcement conducted physical surveillance at a Comerica Bank located at 1090 N San Fernando Blvd, Burbank, CA (the "Target Bank"), which was in an area identified by DSS as among the top locations for EBT fraud.

10.  At approximately 7:20 a.m., law enforcement received information from banking investigators that fraudulent EBT card transactions were actively occurring at the Target Bank.

11.  At the same time, law enforcement saw AGOSTINO at the Target Bank, interacting with the ATM, attempt to withdraw approximately $4,000 in cash from the ATM in rapid succession using at least three different access devices.  While AGOSTINO was still conducting transactions at the ATM, law enforcement approached AGOSTINO for further investigation.

12.  Law enforcement ultimately detained and arrested AGOSTINO and found a total of approximately 105 access devices (approximately 101 are likely to be cloned EBT cards based on the presence of numbered stickers on them, two are debit cards bearing the name of a person other than AGOSTINO, and two are debit cards bearing AGOSTINO's name).  In addition to the access devices, AGOSTINO was also found to be in possession of: two identification cards of persons other than AGOSTINO; nine receipts for declined transactions at another bank in a nearby city; approximately $13,173 in cash; and the SUBJECT DEVICE.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.    Regulatory Background of CalFresh and CalWORKs Programs**

14.  DSS is a government agency that administers several benefit and assistance programs for residents of the state of

California.  One of the assistance programs administered by DSS
is called CalFresh (formerly known as food stamps), which helps
low-income households purchase food and household items to meet
their nutritional needs.  Another assistance program
administered by DSS is called CalWORKs, which helps low-income
families with children pay for housing, food, and other
necessary expenses.

15.  The U.S. Department of Health and Human Services,
Administration for Children and Families, administers the
Temporary Assistance to Needy Families ("TANF") program.  TANF
is a federally funded assistance program that awards grants to
individual states to support low-income families with children.
In California, TANF grant funds are used to operate CalWORKs.

16.  Residents of California that meet the criteria
established by the CalFresh or CalWORKs programs can apply
online for benefits at www.getcalfresh.org and
www.benefitscal.com.  Beneficiaries apply for benefits by
submitting their income and number of dependents to determine
their benefit eligibility.

17.  CalFresh and CalWORKs benefits are issued through
Electronic Benefit Transfer cards ("EBT cards").  EBT cards are
mailed to an address designated by the account holder and
function like traditional debit cards to conduct transactions.
For example, you can use an EBT card to make a purchase at a
grocery or convenient store by swiping the card at a point-of-
sale terminal.

18.   The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN").  A BIN refers to the first five digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

19.   Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month.  Those benefits are deposited directly from DSS into the account of the EBT cardholder.

20.   The EBT cardholders can then conduct cash withdrawals at automated teller machines ("ATMs") using a personal identification number ("PIN") established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

21.   Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards.  Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

22.  A cloned card can be a blank white plastic card or another debit, credit or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

23.  On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card.  This information includes the account number, expiration date, and cardholder's name, among other information.  Whereas on a cloned card, the information contained on the magnetic stripe will not match the information embossed on the front of the card.  For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

24.  Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

25.  The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholder's debit and credit card numbers and personal identification numbers at, for example, ATMs or point-of-sale terminals.  For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number.  Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

26.  As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim accountholder's account information that was obtained from skimming.  Once that information is loaded onto another fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

27.  In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area.  This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time.  Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized

withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

28.  As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud.  Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits.  As a result, law enforcement arrested approximately 16 suspects.  All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States.  All of the individuals arrested were released from local custody within hours of their arrest and absconded from any future judicial proceedings.

29.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area.  Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs.  Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those

withdrawals in rapid succession.  Two of those defendants came
to the ATM together, possessed 35 cloned EBT cards at the time
of arrest, and later analysis of historic ATM surveillance data
showed that they had made more than $190,000 in past attempted
fraudulent EBT withdrawals from a single bank since October
2022.  One additional defendant possessed 269 cloned EBT cards
at the time of arrest, and later analysis of historic ATM
surveillance data showed that the defendant had made more than
$70,000 in past attempted fraudulent EBT withdrawals from a
single bank since January 2023.  All three of these defendants
were determined to be citizens Romania, who did not have
documentation to be lawfully present in the United States.  The
three arrested defendants were ordered detained pending trial by
the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal
grand jury returned two indictments against the three defendants
for bank fraud, in violation of 18 U.S.C. § 1344; aggravated
identity theft, in violation of 18 U.S.C. § 1028A; use of
unauthorized access devices, in violation 18 U.S.C. §
1029(a)(2); and possession of unauthorized access devices, in
violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-
CR-0077-JFW.

     30.  In or about March 2023, federal law enforcement
conducted another surveillance and arrest operation in the Los
Angeles, California area. Law enforcement established
surveillance around the dates when benefits had been disbursed
at select high-volume EBT fraud ATMs. Law enforcement arrested
eleven suspects that conducted a high volume of unauthorized

transactions and that conducted those transactions in rapid succession. At the time of their arrest, the suspects had in their possession over 400 cloned cards, $120,000 in illicitly obtained funds, and multiple skimming devices.

31. Ten out of the eleven of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.

**C.    Background of Current Operation to Combat EBT Fraud**

32. The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2024 and January 1, 2025, more than approximately $126.8 million in cash benefits has been stolen from victim EBT cards throughout California.

33. Of the more than approximately $126.8 million in cash benefits stolen during this year time period, more than approximately $57.9 million has been stolen from victim EBT cards, in the county of Los Angeles alone.  The majority of these funds were stolen through unauthorized ATM withdrawals.

34. Between on or about December 1, 2024, and on or about December 31, 2024, according to data from DSS, more than approximately $11.4 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $11.4 million stolen from victim EBT cards in the month of December 2024, more than approximately $6.2 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

35.   Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

36.   Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

37.   Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of

the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

**D.    AGOSTINO Committed EBT Fraud Using Unauthorized Access Devices on October 1, 2025**

38.    Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement conducted a surveillance and arrest operation in October 2025.

39.    Based upon my training and experience, I know EBT cardholders in California are not able to conduct cash withdrawals of the latest month's benefits from their EBT cards until approximately 6:00 a.m. on the date that the cash benefits are deposited into their account.

40.    On October 1, 2025, at approximately 7:20 a.m., law enforcement began physical surveillance of the Target Bank. At about the same time, law enforcement also began receiving information from banking investigators that fraudulent EBT card transactions were actively occurring at the Target Bank.

41.    At approximately the same time, based on my review of law enforcement reports, conversations with other law enforcement officers, and my own knowledge of the investigation, law enforcement saw AGOSTINO at the Target Bank ATM. AGOSTINO appeared to insert several different cards to conduct withdrawals and store the retrieved currency on his person on

several occasions.  In between transactions, AGOSTINO looked around and checked his surroundings.  Based upon my training and experience, individuals conducting legitimate transactions at ATMs typically conduct a single transaction and do not transition between multiple payment cards rapidly to conduct several transactions in a short period of time.  AGOSTINO was at the ATM conducting multiple withdrawal transactions in rapid succession for approximately four minutes.

42.  Based on the date, time, ATM location, presence of multiple, and successive ATM withdrawals on multiple EBT cardholder accounts during a short time period, law enforcement approached AGOSTINO at the ATM while he was still conducting transactions to investigate further.

43.  Law enforcement ultimately detained and arrested AGOSTINO.  On his person in a wallet, AGOSTINO had 11 cloned EBT cards, a U.S. employment authorization card belonging to a person other than him, two debit cards bearing the name of the person on the employment authorization card, and two debit cards bearing AGOSTINO's name. AGOSTINO also had the keys to a Kia Telluride SUV (the "Kia") which was parked approximately 15 feet away.  It was the only vehicle parked in the Target Bank parking lot at the time.

44.  Law enforcement searched the Kia and found: in a seat pocket, a California identification card of a person other than AGOSTINO; $12,000 cash and 88 likely cloned EBT cards in the center console; and one likely cloned EBT card on a seat.  One

14

additional likely cloned EBT card was also recovered from the
card slot of the Target Bank ATM that AGOSTINO had been using.

45.  Almost all the cloned cards were hotel key cards or
gift cards from various stores such as Walmart, Dunkin' Donuts,
and Dick's Sporting Goods.  The cards had stickers placed on
them with, what appeared to be, based on my training and
experience, card balances and victim PINs.  The following is a
photo of some of the cloned cards and cash seized from AGOSTINO:



46.  Law enforcement analyzed the magnetic stripes of the
11 cloned cards seized from AGOSTINO's person and found that
they were all encoded with mismatching card numbers -- that is,
the physical number embossed on the face of the card, if any,
did not match the number encoded onto the magnetic stripe.  They
were also all encoded with EBT BINs.  Moreover, the cloned cards
were affixed with stickers bearing victim PIN numbers and
balances that closely corresponded to each cloned card and
withdrawal amount and were needed in order to conduct the

unauthorized ATM withdrawals.  Due to the volume of cards seized, law enforcement is still in the process of completing its analysis of the remaining cards, which all also feature the same stickers.

47.  Based on my review of law enforcement reports, conversations with other law enforcement agents, my own knowledge of the investigation, and EBT card transaction data obtained from banking investigators, I know that, at the Target Bank, AGOSTINO attempted to withdraw approximately $4,000 and successfully withdrew $1,000.  AGOSTINO attempted approximately four transactions involving at least three different access devices encoded with EBT account numbers.

48.  In the Kia, law enforcement also found nine receipts for declined ATM transactions that occurred at Chase Bank, 1635 W Glenoaks Blvd, Glendale, CA, on October 1, 2025, between 6:54 a.m. and 7:05 a.m.  Each attempted transaction was for an $800 cash withdrawal from a different account number.  EBT card transaction data obtained from banking investigators showed that there were approximately 15 total EBT transactions at that ATM during that time period affecting 14 different EBT account numbers.  Of these attempts, there were approximately five successful withdrawals of $800 each, totaling $4,000.

49.  Banking investigators searched EBT cardholder information and could not locate an EBT account that belonged to AGOSTINO.  Based on this, law enforcement believes that AGOSTINO is not an EBT benefits recipient and is not a legitimate EBT cardholder.

50.  The SUBJECT DEVICE was retrieved from AGOSTINO's person and secured in law enforcement custody pending issuance of a search warrant.

**V.  <u>TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES</u>**

51.  Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a.  It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once.  Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft.  Suspects often use digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet.  They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.  Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items

retrieved from stolen mail or mail matter, with their cellphones.

      c.   It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

      d.   It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers or cellular telephones.

      e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-

conspirators in order to conduct their business. Oftentimes, they do so on their digital devices. Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos. Suspects may also have paper copies of such records, which they may keep on their person or in their cars, homes, or storage units.

      f.   Individuals engaged in mail and identity theft often use multiple digital devices, which they may keep on their person or in their cars or homes.

### VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

52. As used herein, the term "digital device" includes the SUBJECT DEVICE.

53. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

      a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

       c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

       d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

54. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

55. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

56.  For all of the reasons described above, there is probable cause to believe that AGOSTINO has committed violations of 18 U.S.C. § 1029(a)(2), (b)(1) (use and attempted use of unauthorized access devices).  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 2nd day of
October, 2025.


_____
HONORABLE KAREN STEVENSON
UNITED STATES MAGISTRATE JUDGE

## <u>ATTACHMENT A</u>

### <u>PROPERTY TO BE SEARCHED</u>

A black iPhone in a clear case, seized from Massimo
Agostino (the "SUBJECT DEVICE") on October 1, 2025, and
currently maintained in the custody of Burbank Police
Department.

**ATTACHMENT B**

I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1029 (Fraud and Related Activity in Connection with Access Devices), 1344 (Bank Fraud), and 1028A (Aggravated Identity Theft), namely:

a.    Records, documents, or materials relating to Access devices, access card skimming devices, and device-making equipment, including photos of debit or credit cards, gift cards, or any other cards bearing magnetic stripes; photos of equipment used for reading or making the same, such as skimming devices, card readers or magnetic stripe reading/encoding devices, embossers, tippers, card printers, or the accessories required to use the same; photos of electronic components for assembling and installing skimming devices; photos of soldering mats or soldering residue; notes or logs of PIN numbers or ZIP codes;

b.    Records, documents, or materials relating to cloned cards, including photos of blank white plastic cards or debit, credit or gift cards that contains altered information on the card's magnetic stripe;

c.    Records, documents, or materials relating to EBT cards, including, personal identification number (PIN), card holder's name, card holder's account number and card holder's expiration date;

    d. Records, documents, or materials relating to ATM locations;

    e. Data, records, documents, or information (including electronic mail and messages) pertaining to obtaining, possessing, using, or transferring personal and/or financial transaction identification information for persons other than Massimo Agostino ("AGOSTINO"), such as names, addresses, phone numbers, credit and debit card numbers, security codes, bank account and other financial institution account numbers, Social Security numbers, email addresses, IP addresses, as well as PIN numbers and passwords for financial institutions or internet service providers;

    f. Records, documents, or materials relating to storage locations, including records indicating the location, ownership or control of any storage lockers, storage garages, trailers, residences, hotel rooms, rental premises, vaults, safe deposit boxes, or other locations where any digital devices, cash or monetary instruments, or access devices or device-making equipment may be stored, as well as any keys or access devices required to access the same;

    g. Records, documents, or materials of who used, owned, or controlled the SUBJECT DEVICE at the time the things described in this warrant occurred;

    h. Records, documents, programs, applications, or materials pertaining to applications for, or use of, credit or debit cards, bank accounts, or merchant processor accounts;

i.   Data, records, documents (including e-mails), or information reflecting or referencing purchases of merchandise, securities, electronic currency, and other valuable things;

j.   Software, devices, or tools used to obtain, create, or use counterfeit or unauthorized checks, coupons, or access devices such as credit, debit, bank, and gift cards;

k.   Any documents or records relating to any bank accounts, credit card accounts, or other financial accounts;

l.   Records, documents, programs, applications, or materials relating to United States mail or mail matter;

m.   Contents of any calendar or date book stored on any of the digital devices;

n.   Global Positioning System ("GPS") coordinates and other information or records identifying travel routes, destinations, origination points, and other locations;

o.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to show address book information, including all stored or saved telephone numbers;

p.   Records, documents, programs, applications and materials, or evidence of the absence of same, sufficient to show call log information, including all telephone numbers dialed from any of the digital devices and all telephone numbers accessed through any push-to-talk functions, as well as all received or missed incoming calls;

q.   Records, documents, programs, applications or materials, or evidence of the absence of same, sufficient to

show SMS text, email communications or other text or written
communications sent to or received from any of the digital
devices and which relate to the above-named violations;

r.   Records, documents, programs, applications or
materials, or evidence of the absence of same, sufficient to
show instant and social media messages (such as Facebook,
Facebook Messenger, Snapchat, FaceTime, Skype, and WhatsApp),
SMS text, email communications, or other text or written
communications sent to or received from any digital device and
which relate to the above-named violations;

s.   Audio recordings, pictures, video recordings, or
still captured images of United States mail or mail matter,
whether opened or unopened, or relating to the collection or
transfer of the proceeds of the above-described offenses; and

t.   Any digital device which is itself or which
contains evidence, contraband, fruits, or instrumentalities of
the Subject Offenses, and forensic copies thereof, including but
not limited to the SUBJECT DEVICE.

u.   With respect to any digital device containing
evidence falling within the scope of the foregoing categories of
items to be seized:

i.   evidence of who used, owned, or controlled
the device at the time the things described in this warrant were
created, edited, or deleted;

ii.   evidence of the presence or absence of
software that would allow others to control the device, such as
viruses, Trojan horses, and other forms of malicious software,

as well as evidence of the presence or absence of security
software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iv.  evidence of counter-forensic programs (and
associated data) that are designed to eliminate data from the
device;

v.   evidence of the times the device was used;

vi.  applications, programs, software,
documentation, manuals, passwords, keys, and other access
devices that may be necessary to access the device or data
stored on the device, to run software contained on the device,
or to conduct a forensic examination of the device;

vii. records of or information about Internet
Protocol addresses used by the device.

2.   As used herein, the terms "records," "information,"
"documents," "programs," "applications," and "materials" include
records, information, documents, programs, applications, and
materials created, modified, or stored in any form, including in
digital form on any digital device and any forensic copies
thereof.

3.   As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
telephone paging devices, beepers, mobile telephones, and smart
phones; digital cameras; gaming consoles (including Sony

PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed one year from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this one year period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

       i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the scope of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of items to be seized.

       ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

       iii. The search team may use forensic examination and searching tools, such as "EnCase," "Griffeye," and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

      c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

      d.   If the search determines that a digital device does not contain any data falling within the scope of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

      e.   If the search determines that a digital device does contain data falling within the scope of items to be

seized, the government may make and retain copies of such data, and may access such data at any time.

f.    If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the scope of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.    The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.    After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.    The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the

custody and control of attorneys for the government and their support staff for their independent review.

6.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.